IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CHRISTOPHER CHASE SPENCER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CIV-06-500-C |
| | ) | |
| (1) JEFF LANDRITH, in his official | ) | |
| capacity as MAYOR OF CITY OF | ) | |
| MUSTANG, a political subdivision of | ) | |
| Oklahoma; | ) | |
| (2) MONTE L. JAMES, in his official | ) | |
| capacity as CHIEF OF POLICE of the CITY | ) | |
| OF MUSTANG POLICE DEPARTMENT; | ) | |
| (3) CAMIE McNEIL, in her official capacity; | ) | |
| (4) KIRK DICKERSON, in his individual | ) | |
| and official capacities; | ) | |
| (5) CLIFF DACUS, in his individual and | ) | |
| official capacities; and | ) | |
| (6) TERRY DWAYNE TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

Now before the Court are a motion for partial summary judgment filed by Plaintiff

Christopher Chase Spencer against all Defendants (Pl.'s Mot., Dkt. No. 85) and a motion for

summary judgment on all claims, filed by all Defendants except Terry Taylor (Defs.' Mot.,

Dkt. No. 88).[1]  With the exception of Taylor, the parties have responded (Defs.' Resp., Dkt.

No. 104; Pl.'s Resp., Dkt. No. 102).  Having considered the submissions of the parties, the

---

[1] Mr. Taylor is proceeding pro se and has not filed a motion for summary judgment in this case nor responded to the motion for summary judgment brought by Plaintiff against him. References to "Defendants" herein refer only to Defendants Landrith, James, McNeil, Dickerson, and Dacus unless otherwise specified.

Court now DENIES Plaintiff's motion for partial summary judgment and GRANTS Defendants' motion for summary judgment.

## I.  STANDARD OF REVIEW

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way and is 'material' when it is essential to the proper disposition of the claim." Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006) (citation and internal quotation marks omitted), cert. denied, 127 S. Ct. 1372 (2007).

The movant bears the initial burden of demonstrating the absence of material fact requiring judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the movant carries this initial burden, the nonmovant must then set forth "specific facts" outside the pleadings and admissible into evidence which would convince a rational trier of fact to find for the nonmovant. Fed. R. Civ. P. 56(e).  These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." Celotex, 477 U.S. at 324.  "The burden is not an onerous one for the nonmoving party in each case, but does not at any point shift from the nonmovant to the district court." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998).  All facts and reasonable

inferences therefrom are construed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

With respect to cross-motions for summary judgment, the Court must evaluate each motion on its own merits, construing all inferences in favor of the party against whom the motion under consideration is made.  See Pirkheim v. First Unum Life Ins., 229 F.3d 1008, 1010 (10th Cir. 2000).  Although summary judgment is inappropriate if disputes remain as to material facts, the Court is permitted "to assume that no evidence needs to be considered other than that filed by the parties."  Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000) (citation and internal quotation marks omitted).  The Court analyzes each cross-motion for summary judgment separately; "the denial of one does not require the grant of another."  Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (citation and internal quotation marks omitted).

## II.  BACKGROUND

On May 17, 2004, Plaintiff was a minor living in Yukon, Oklahoma.  He and his friend Russell Bell drove to the City of Edmond early that Friday evening to "hang out" with Plaintiff's half-brother.  While in Edmond, Plaintiff consumed as many as three beers.  (Pl.'s Resp. at 2.)  Later that evening they drove to the City of Mustang.  Bell was riding as a passenger in Plaintiff's pickup truck.  (Pl.'s Dep. at 16.)  When Plaintiff and Bell returned to Mustang around 8:30 or 9:00 p.m., after dark, Bell was drinking beer from a bottle in Plaintiff's pickup; Plaintiff delayed dropping Bell off at home so that Bell could finish drinking his beer and instead drove around a neighborhood in Mustang.  (Id. at 22-23.)  In

3

addition to this bottle, Bell had drunk at least two more bottles of beer on the way back from Edmond. (Id. at 21.) In his truck, Plaintiff was transporting a less-than-full twenty-pack case of beer bottles as well as Bell's open bottle of beer. (Id. at 20-21, 52.)

Defendant Terry Taylor's house was in the neighborhood where Plaintiff and Bell were driving around. Although Plaintiff did not personally know Taylor, Bell told Plaintiff that Taylor had once chased Bell and one of Bell's friends. (Id. at 23.) So when Plaintiff drove past Taylor's house, Bell threw two beer bottles into Taylor's yard. Plaintiff proceeded to drive Bell home. (Id. at 23-24.) While dropping Bell off at his house, Plaintiff saw a car speeding around the corner in his truck's rearview mirror. Plaintiff presumed that Taylor was in the car. Bell ran into his house, and Plaintiff "took off." (Id. at 24.) Plaintiff sped through the neighborhood to get away from Taylor, but Taylor soon pulled his car in front of Plaintiff's truck, and so Plaintiff slammed on his brakes and put his truck in reverse. Plaintiff backed up and tried to turn around, but his truck got stuck on an incline. (Id. at 24-25.) Taylor exited his car and approached Plaintiff at the driver's side of Plaintiff's truck, yelling at Plaintiff. Taylor was "screaming" at Plaintiff to "get out of the [truck] and that he was going to kick [Plaintiff's] ass." (Id. at 25-26.) When Plaintiff refused to roll down his driver's side window, Taylor crossed to the passenger side, grabbed that window, and pulled until it shattered. Taylor tried to pull Plaintiff through the window by his neck, so Plaintiff agreed to get out of the truck. Taylor grabbed Plaintiff by the arm, forced Plaintiff into his car, and then sped back to Taylor's house. (Id. at 26-27, 29.)

When they reached Taylor's house, Taylor told a woman present there to call 911.  As a result, Officers Dickerson and Dacus were dispatched on a disturbance call to Taylor's house.  (Defs.' Resp. Ex. 1, Dacus Dep. at 44; Ex. 2, Dacus Narrative; Ex. 5, Dickerson Narrative.)  When the woman returned from inside the house, she brought a pair of handcuffs, apparently a toy but made out of metal.  Taylor placed these on Plaintiff's wrists.  (Pl.'s Dep. at 33.)  Before any police officers arrived, Taylor punched Plaintiff behind his right ear one time, knocking him to the ground.  (Id.)  Taylor then dragged Plaintiff across the driveway and planted one foot on either Plaintiff's back or neck while Plaintiff was face down on the ground.  (Id. at 34-36; Dacus Dep. at 59-60.)  Bell's parents came to Taylor's house and unsuccessfully tried to get Taylor to release Plaintiff; Taylor refused because "he was waiting on the cops."  (Pl.'s Dep. at 36-37.)

Mustang police officers Dacus and Dickerson then arrived at the scene.  The Mustang Police Department had been called to Taylor's house on previous occasions for domestic disturbance issues, and its officers were familiar with Taylor.  (Dacus Dep. at 22-25.)  Dacus immediately ordered Taylor to release Plaintiff, and Plaintiff felt some relief that the officers were coming to his rescue.  (Pl.'s Dep. at 95-96.)  Dacus removed Taylor's handcuffs from Plaintiff's wrists.  Taylor's handcuffs were "so tight" on Plaintiff's wrists that they did not slide and left marks on his wrists.  (Id. at 39 & 141.)

Here the parties' stories diverge as to the exact sequence of events.  This conflict, however, is ultimately immaterial for purposes of summary judgment as explained further below.  According to Plaintiff, Dacus "immediately" placed police handcuffs on Plaintiff, led

Plaintiff to the police car where the light was better, and administered a field sobriety test. (Id. at 39, 76.) Plaintiff testified he was then placed in the back of the police car and sat there while Taylor talked to the police officers; Plaintiff could not hear their conversation. Then the officers opened the police car door and instructed Taylor to lean into the car and tell Plaintiff that he (Taylor) was placing Plaintiff under citizen's arrest for D.U.I. (driving under the influence). (Id. at 39, 106.) Plaintiff was then driven to the police station.

Under Defendants' version of events, Dacus led Plaintiff away from Taylor over to where his police car was parked at least thirty feet away, and Dacus administered a field sobriety test to Plaintiff. (Dacus Dep. at 53). Only following that test, five to ten minutes after freeing Plaintiff from Taylor, did Dacus place police handcuffs on Plaintiff. (Id. at 53-54.) Dacus then told Plaintiff he was under citizen's arrest by Taylor for D.U.I. and placed Plaintiff in the police car. (Id. at 53.)

Here the parties' stories reunite for the most part. While Plaintiff was in the police car, Taylor provided a written voluntary statement stating, inter alia, that he had seen Plaintiff's truck drive by and a passenger throw something out the window and that he could tell Plaintiff had been drinking and appeared drunk. (Defs.' Mot. Ex. 3; Dacus Dep. at 54.) Taylor also signed a citizen's arrest form "for the public offense of D.U.I. committed in [Taylor's] presence"; the form stated that Taylor was delivering Plaintiff to Officer Dacus. (Defs.' Mot. Ex. 4; Dacus Dep. at 54.) In the meantime, because Taylor had told Dickerson that Plaintiff had been driving erratically and that his truck was parked partially on the railroad tracks, Dickerson left the Taylor residence and drove to check on Plaintiff's pickup. (Dacus Dep. at

57; Dickerson Narrative at 1.)  Inside the pickup he observed the open, less-than-full case of beer as well as numerous beer bottle tops.  (Dickerson Narrative at 1.)

Dacus drove Plaintiff to the police station where he performed an Intoxilyzer breath-alcohol analysis on Plaintiff.  Plaintiff's breath registered a .01g/210 L alcohol concentration. (Pl.'s Resp., Ex. 22; Pl.'s Dep. at 116.)  While at the station, Plaintiff asked Dacus if Dacus could look at the injury Taylor had inflicted on his head and asked to see a doctor.  (Pl.'s Dep. at 42, 111-12.)  Dacus looked at Plaintiff's head and determined that Plaintiff was fine.  (Id. at 42.)  Plaintiff later mentioned once more that his head hurt.  (Id. at 111-12.)  Dacus released Plaintiff to the care and custody of his father.  (Id. at 43.)

On May 5, 2006, Plaintiff filed this federal action pursuant to 42 U.S.C. § 1983. Remaining for trial are these claims against Defendants: Plaintiff's constitutional claims that he was arrested without probable cause and that he was denied proper medical care, and supplementary state law claims of: (1) negligent hiring, retention, and supervision; (2) false imprisonment; (3) false arrest;[2] (4) assault and battery; and (5) intentional and negligent

---

[2] Although Plaintiff included a cause of action for "abuse of process," Defendants rightfully note – and Plaintiff does not deny – that Plaintiff's allegations actually complain of "unlawful detention" rather than abuse of process.  (See Am. Compl. ¶¶ 22-24; Defs.' Mot. at 13 n.3.) Plaintiff's unlawful detention allegation is essentially enveloped by his state law false arrest and false imprisonment claims; although the terms false imprisonment and false arrest are often used interchangeably, the gist of either tort is unlawful detention.  In Oklahoma there lies a distinction in how the causes of action arise: a tort claim arising from the wrongful detention of a person by an individual acting under the authority of law is called false arrest, but if a person is wrongfully detained by a private individual who does not act under color of law, then the appropriate tort claim is for false imprisonment.  See McGlone v. Landreth, 1948 OK 85, ¶ 10, 195 P.2d 268, 271, overruled in part on other grounds by Parker v. Washington, 1966 OK 263, 421 P.2d 861; cf. Wallace v. Kato, 127 S. Ct. 1091, 1095 (2007) (noting that in the context of constitutional tort claims, the torts of false arrest and false imprisonment are to be referred to together as "false imprisonment," because "[t]he sort of unlawful detention remediable by the tort of false

infliction of emotional distress.[3]  (See Order, Dkt. No. 74, at 2.)  Plaintiff's arguments are unclear at best and deviate substantially from the claims that his motion is intended to address. It appears, however, that Plaintiff seeks summary judgment on his constitutional claim of arrest without probable cause as well as his state law negligent supervision and retention claims.

Although the parties have provided the Court with voluminous, mostly disputed facts regarding many tangential aspects of this case, for summary judgment purposes the Court need analyze only those facts that bear upon whether either party is entitled to judgment as a matter of law.  "The presence of factual disputes, however, will preclude granting of summary judgment only if the disputes are genuine and concern material facts.  We must look to substantive law to identify which facts are material."  Watson v. City of Kan. City, 857 F.2d 690, 694 (10th Cir. 1988) (citation omitted).

## III.  DISCUSSION

### A.  Constitutional Claims

#### 1.  Defendants Landrith, James, and McNeil

Plaintiff argues that the City of Mustang had an unlawful custom of permitting Taylor to use excessive force and failing to arrest Taylor when warranted.  According to Plaintiff, this

---

imprisonment is detention without legal process"); Dry v. United States, 235 F.3d 1249, 1257 (10th Cir. 2000) (finding no authority that plaintiffs' unlawful detention claim alleged a cause of action distinct from their false imprisonment claim under the FTCA, because the "traditional and commonly understood legal definition" found in cases "suggest[s] that 'unlawful detention' is an element of-or simply another name for-'false imprisonment'").

[3] Plaintiff has withdrawn his state law defamation claim.  (See Pl.'s Resp. at 8-9.)

custom resulted in his unlawful arrest and should subject city officials to liability. However, there is a lack of reliable evidence indicating that the City had an unlawful custom connected to his alleged constitutional violations. See Jenkins v. Wood, 81 F.3d 988, 993-94 (10th Cir. 1996). In support of this theory, Plaintiff presented various items of evidence, including numerous Mustang police reports mentioning Taylor's name. (See Pl.'s Mot. Exs. 3-17, 19.) While Defendants do not deny past interaction with Taylor, they rightfully object to the conclusion that reports of these incidents and the other evidence establish an unlawful custom regarding Taylor. First, many of these incidents arose after May 17, 2004, and thus are not indicative as to whether there was a custom in place regarding Taylor when Plaintiff was arrested. (See Pl.'s Mot. Exs. 13, 14, 15, 16, 17, 19.) Next, Taylor was in fact placed under arrest by Mustang officers at least once prior to the incident involving Plaintiff. (See Pl.'s Ex. 3.) Finally, several of the reports outline property crimes and threatening phone calls where Taylor was the alleged victim, rather than the transgressor. (See Pl.'s Exs. 8, 9, 10.) The evidence before the Court undoubtedly does demonstrate that Taylor was on Defendants' "radar screen," but it does not show that the City of Mustang had an unlawful custom regarding Taylor or that such a custom resulted in Plaintiff's alleged constitutional violations.

Moreover, Plaintiff does not allege or establish that Mayor Landrith, Chief James, or Detective McNeil personally participated in either of his alleged constitutional deprivations. Therefore, even if Plaintiff could sufficiently demonstrate his claim of arrest without probable cause or his claim of denial of medical treatment, these Defendants would not be liable for a violation of Plaintiff's constitutional rights. "Personal participation is an essential allegation

in a § 1983 claim."   <u>Bennett v. Passic</u>, 545 F.2d 1260, 1262-63 (10th Cir. 1976).   "A

supervisor is not liable under § 1983 unless an 'affirmative link' exists between the

constitutional deprivation and either the supervisor's personal participation, his exercise of

control or direction, or his failure to supervise."   <u>Butler v. City of Norman</u>, 992 F.2d 1053,

1055 (10th Cir. 1993).   Thus, these Defendants are entitled to judgment on Plaintiff's

constitutional claims.

### 2.   *Defendants Dickerson and Dacus*

The specific facts of this case would not convince a rational trier of fact that Plaintiff

suffered a constitutional violation.   Therefore, Dickerson and Dacus are entitled to summary

judgment on both constitutional claims.[4]

### a.   *Lack of Probable Cause to Arrest Plaintiff*

Plaintiff asserts that the officers lacked probable cause to arrest him pursuant to the

"citizen's arrest" effected by Taylor.[5]   However, the evidence provided by all the parties

---

[4] Defendants Dickerson and Dacus assert qualified immunity as a defense to claims against them in their individual capacities.   "This defense shields government officials performing discretionary functions from liability 'if their conduct does not violate clearly established rights of which a reasonable government official would have known.'"   <u>Graves v. Thomas</u>, 450 F.3d 1215, 1218 (10th Cir. 2006) (citation omitted).   Because Plaintiff fails to present a genuine issue regarding a constitutional violation, it is not necessary to examine whether Defendants would be entitled to qualified immunity.

[5] Under Oklahoma law,
the authority to arrest, either as a police officer or as a private citizen, is controlled by statute.   "Arrest" is defined in 22 [Okla. Stat.] § 186 as "the taking of a person into custody, that he may be held to answer for a public offense."   An arrest is accomplished by "actual restraint" of the person or "by his submission to the custody" of an officer.   An arrest may be effected by "a private person," for, among other things, "a public offense committed or attempted" in the presence of the person.

establishes: Taylor actually physically restrained and took Plaintiff into custody so that he could be held to answer to the police, and Taylor informed the police that he believed Plaintiff had been driving under the influence of alcohol and that a passenger had thrown a bottle out of Plaintiff's truck.  Plaintiff admitted that he had been speeding in his pickup truck through the neighborhood.  Officer Dacus observed Plaintiff, who was under the age of twenty-one, with bloodshot and glassy eyes, unsteady on his feet, slurred speech, and smelling of alcohol. (Dacus Dep. at 52-53; Dacus Narrative at 2.)  Plaintiff admitted that he had red, watery, bloodshot eyes that night, that it was possible his speech was slurred and he was a little unsteady on his feet, and that it was possible someone could have smelled alcohol on him. (Pl.'s Dep. at 75-77.)  When Dacus administered the field sobriety test, which was a horizontal gaze nystagmus test, he got more clues to indicate that Plaintiff was intoxicated.  (Dacus Dep. at 53; Dacus Narrative at 2.)

A warrantless arrest is permissible under the Fourth Amendment if there is probable cause to believe that the arrestee committed a crime.  Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995).  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  Id. (citation and internal quotation marks omitted).

---

Burke v. State ex rel. Dep't of Pub. Safety, 2005 OK CIV APP 92, ¶ 9, 125 P.3d 685, 687 (citations omitted).

Plaintiff had drunk alcohol that night, and at the police station his breath registered a .01g/210 L alcohol concentration less than an hour and a half after police took him into custody.  Under Oklahoma law,

> "[i]t is unlawful . . . for any person under twenty-one (21) years of age to drive, operate, or be in actual physical control of a motor vehicle within this state who:
> 1. Has any measurable quantity of alcohol in the person's blood or breath at the time of a test administered within two (2) hours after an arrest of the person;
> 2. Exhibits evidence of being under the influence of any other intoxicating substance as shown by analysis of a specimen of the person's . . . breath . . . ; or
> 3. Exhibits evidence of the combined influence of alcohol and any other intoxicating substance.

47 Okla. Stat. § 11-906.4(A).  As a minor, therefore, it would have been unlawful for Plaintiff to have been driving with "any measurable quantity of alcohol" on his breath.

Plaintiff's opinion is that the officers did not take sufficient additional steps to verify what was happening at Taylor's house before they took him into custody.  However, whether more could have been done is not determinative; the Court must focus on whether Defendants had probable cause to continue the arrest effected by Taylor and take Plaintiff into detention rather than Plaintiff's dissatisfaction with the proceedings.  See Romero, 45 F.3d at 1476.

> Although the court may determine whether probable cause existed at the time of the arrest by taking into account factors such as whether the officer reasonably interviewed witnesses readily available at the scene, whether he investigated basic evidence or whether he inquired if a crime had been committed at all before invoking the power of warrantless arrest and detention, none of these factors is dispositive or indeed necessary to the inquiry.  The primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the [arresting] offic[er].

12

<u>Olsen v. Layton Hills Mall</u>, 312 F.3d 1304, 1312 (10th Cir. 2002) (alterations in original) (citations and internal quotation marks omitted).

Officer Dacus's observations at the scene provided probable cause to believe Plaintiff was a minor who had been driving under the influence of alcohol and thus the officers' conduct did not violate any constitutional or statutory rights.  Because a reasonable officer would have believed that probable cause existed for arrest, Defendants, not Plaintiff, are entitled to summary judgment on this claim.

b.      *Unlawful Denial of Medical Treatment*

Plaintiff, who did not move for summary judgment on this claim, alleges that he was denied medical attention while in custody with the Mustang Police Department.

> A plaintiff states a cognizable Eighth Amendment claim for denial of medical attention if he allege[s] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. . . .  "Deliberate indifference" involves both an objective and a subjective component.  The former is met if the deprivation is sufficiently serious-that is, if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  The latter is satisfied if an officer knows of and disregards an excessive risk to [a detainee's] health or safety.  Essentially, the officer must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

<u>Id.</u> at 1315 (alterations in original) (citations and internal quotation marks omitted).

Once again, Plaintiff has failed to set forth specific facts which would convince a rational trier of fact to find that he was improperly denied medical attention.  Plaintiff has not alleged acts or omissions by Officers Dacus or Dickerson that evidence deliberate indifference to serious medical needs, nor that they knew of and disregarded an excessive risk to Plaintiff's

13

safety.  The evidence is undisputed that the officers actually <u>removed</u> Plaintiff from an unsafe situation; Plaintiff himself said that he felt relief and that he thought the officers felt that they were doing the right thing.  Either because he refused when asked or for some other reason, Plaintiff did not explain to the officers the events that had occurred while at Taylor's house.  (Dacus Dep. at 58, 73; Pl.'s Dep. at 105.)  When Plaintiff mentioned to Dacus that his head hurt and he wished to see a doctor, Dacus did give Plaintiff a cursory examination and determined he was fine.  Plaintiff did not mention any other injuries to the officers.  (Pl.'s Dep. at 46.)  Neither "accidental or inadvertent failure to provide adequate medical care" nor "negligent diagnosis or treatment of a medical condition" rises to the level of deliberate indifference to serious medical needs, and such treatment is not a constitutional violation. <u>Ramos v. Lamm</u>, 639 F.2d 559, 575 (10th Cir. 1980).

None of the police officers physically or verbally abused Plaintiff.  Most telling, Plaintiff was at the police station for approximately an hour, but after he was released he waited until the next day to see a physician rather than visiting the emergency room that night.  Plaintiff was prescribed rest, time off work, an anti-inflammatory, and a painkiller.  While Plaintiff did take that medication, he sought no refills, no follow-up treatment, no physical therapy, and no counseling as a result of his injuries that night.  Indeed, he stopped wearing his neck brace after a few days because he got tired of wearing it.  (<u>See</u> Pl.'s Dep. at 56-58.) There is nothing in Plaintiff's medical treatment records that demonstrates any "substantial" or "excessive" harm had been done to Plaintiff.  Defendants are entitled to summary judgment on this claim.

14

*3. Defendant Terry Taylor*

Although a pro se litigant's pleadings are liberally construed and "held to a less stringent standard" than those drafted by attorneys, <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991), this does not relieve the nonmoving Taylor from carrying his burden in defeating a motion for summary judgment. Taylor, who is not a government employee, did not file a response to Plaintiff's June 1, 2007, motion for summary judgment within the eighteen days allotted by local rule, <u>see</u> LCvR7.1(g), nor did he file a Fed. R. Civ. P. 56(f) affidavit demonstrating why he could not yet present evidence in opposition to the motion. Even without a response from Taylor, the Court must determine whether judgment for the moving party is appropriate under Fed. R. Civ. P. 56. <u>Reed v. Bennett</u>, 312 F.3d 1190, 1193 (10th Cir. 2002). When a nonmoving party does not respond to a motion for summary judgment, he or she "waives the right to respond or to controvert the facts asserted in the summary judgment motion. The court should accept as true all material facts asserted and properly supported . . . . But only if those facts entitle the moving party to judgment as a matter of law should the court grant summary judgment." <u>Id.</u> at 1195.

Following a thorough review of Plaintiff's arguments, it is clear that even if all asserted material facts were accepted as true, Taylor cannot be liable on Plaintiff's § 1983 claim of arrest without probable cause. Section 1983

> creates a cause of action against individuals who violate federal law while acting "under color of state law." The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the

15

wrongdoer is clothed with the authority of state law.  The defendant's authority
may be actual or apparent.

David v. City and County of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996) (citations and

internal quotation marks omitted); see also Gallagher v. "Neil Young Freedom Concert", 49

F.3d 1442, 1447 (10th Cir. 1995) ("[T]he only proper defendants in a Section 1983 claim are

those who represent [the state] in some capacity, whether they act in accordance with their

authority or misuse it.") (second alteration in original) (citations and internal quotation marks

omitted).

Various theories of liability do exist under which actions of a private individual such

as Taylor can be considered as taken "under color of state law."  Plaintiff argues that several

of them are applicable here, including the nexus, joint action, and symbiotic relationship

theories.  (See Pl.'s Mot. at 10-14 (citing Dennis v. Sparks, 449 U.S. 24, 29 (1980); Gallagher,

49 F.3d at 1447-56; Massey v. Bd. of Trs., 4 F. App'x 611, 613-14 (10th Cir. 2001)

(unpublished)).)  Plaintiff similarly attempts to hold Defendants responsible for the acts of

Taylor under a "danger creation" theory.  (See Pl.'s Mot. at 6-10 (citing Christiansen v. City

of Tulsa, 332 F.3d 1270, 1281-82 (10th Cir. 2003))).

Following analysis of the facts of this case under each of these theories, it is clear that

Plaintiff has not asserted material facts showing that Taylor is a proper defendant for his

federal constitutional claim or that Defendants should be held liable for Taylor's actions.

While Plaintiff may have remaining grounds for relief against Taylor, the evidence as outlined

above clearly demonstrates that Taylor's pursuit, arrest, and detention of Plaintiff were

factually and legally independent of any state action and were not taken under color of law. State actors generally "are liable only for their own acts, and not the violent acts of third parties." <u>Armijo ex rel. Chavez v. Wagon Mound Pub. Schs.</u>, 159 F.3d 1253, 1260 (10th Cir. 1998). Therefore, the Court will grant Taylor judgment on this claim.[6]

## B.  State Law Claims

Having found that summary judgment is appropriate on Plaintiff's federal law claims, the Court must determine whether to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. The Tenth Circuit has held that when federal claims are resolved before trial, the district court should usually decline to exercise jurisdiction over the state law claims and allow the plaintiff to pursue them in state court. <u>See</u> <u>Ball v. Renner</u>, 54 F.3d 664, 669 (10th Cir. 1995); <u>cf.</u> <u>Smith v. City of Enid</u>, 149 F.3d 1151, 1156 (10th Cir. 1998). Having disposed of his federal claims prior to trial and finding no indication that the Court should be required to retain and dispose of Plaintiff's state law claims, the Court, in its discretion and pursuant to 28 U.S.C. § 1367(c)(3), declines to exercise supplemental jurisdiction over Plaintiff's state law claims. The Court shall dismiss the state law claims without prejudice. <u>See</u> <u>Robey-Harcourt v. Bencorp Fin. Co.</u>, 212 F. Supp. 2d 1332, 1335 (W.D. Okla. 2002).

---

[6]  <u>See</u> <u>Holmes v. Utah, Dep't of Workforce Servs.</u>, 483 F.3d 1057, 1067 (10th Cir. 2007); <u>David</u>, 101 F.3d at 1358-59 (noting that the entry of summary judgment sua sponte is warranted provided there is no dispute of material fact and the losing party was allowed to address the issues involved and put on notice to come forward with all of its evidence).

IV.  CONCLUSION

As outlined more fully herein, the Court DENIES Plaintiff's motion for partial summary judgment (Dkt. No. 85).  The Court GRANTS Defendants' motion for summary judgment (Dkt. No. 88) and judgment is granted to all Defendants as to Plaintiff's federal law claims.  Plaintiff's state law claims are DISMISSED without prejudice.  All pending motions are hereby STRICKEN as MOOT.

Judgment shall be entered accordingly.

IT IS SO ORDERED this 8th day of August, 2007.


ROBIN J. CAUTHRON
United States District Judge